AARON D. FORD
Attorney General
VICTORIA C. COREY (Bar No. 16364)
Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, Nevada 89119
(702) 486-0849 (phone)
(702) 486-3768 (fax)
Email: vcorey@ag.nv.gov

*Attorneys for Defendants*
*Scott Davis, Tim Garrett, Kara LeGrand,*
*Donald Southworth, and Harold Wickham*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ANDRE HARDIMAN,

Plaintiff,

v.

SCOTT DAVIS; et al.,

Defendants.

Case No. 3:23-cv-00584-MMD-CLB

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, Scott Davis, Tim Garrett, Kara LeGrand, Donald Southworth, and Harold Wickham, by and through counsel, Aaron D. Ford, Attorney General for the State of Nevada, and Victoria C. Corey, Senior Deputy Attorney General, hereby move this Court, pursuant to Fed. R. Civ. P. 56, for an Order granting Summary Judgment.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. BACKGROUND OF THE CASE

This action is brought pursuant to 42 U.S.C. § 1983 by Andre Hardiman ("Hardiman"), an offender currently in the custody of the Nevada Department of Corrections ("NDOC"). *See* ECF No. 8. Following mandatory screening of the First Amended Complaint ("FAC"), Hardiman was permitted to proceed with First Amendment Free Exercise, RLUIPA, Fourteenth Amendment Equal Protection, and 28 U.S.C. § 1985(3)

///

conspiracy claims against Defendants Davis, LaGrand, Southworth, Garrett, and Wickham. ECF No. 9 at 10:14–19.

Hardiman alleges the following: Beginning in November 2022 and continuing through August 2023, Defendants LaGrand and Davis devised and implemented a chapel schedule intended to deprive Orthodox Islam–practicing inmates housed in low-level units of the ability to engage in their religious exercise. *See* ECF No. 8 at 3 ¶ 4. Defendants Southworth, Garrett, and Wickham allegedly acquiesced in that schedule, as evidenced by their "copy and paste" responses to Hardiman's grievances. *Id.* Moreover, all five (5) Defendants allegedly conspired to enforce the "Level System Policy" in a manner that deprived Orthodox Islamic–practicing inmates of the ability to participate in their faith, including by collectively disallowing level 2 and 3 inmates from attending Jumu'ah on Fridays at 12:15 p.m. *Id.* at 4 ¶ 4.

This Court should grant Defendants' motion for summary judgment because the undisputed facts establish that (1) no violation of the First Amendment or RLUIPA occurred, (2) no violation of the Fourteenth Amendment or 28 U.S.C. § 1985(3) occurred, and (3) Defendants are entitled to qualified immunity.

## II. STATEMENT OF UNDISPUTED FACTS

### A. Chapel and Religious Actives Room Schedule

At all times relevant to Hardiman's allegations, he was housed at Lovelock Correctional Center ("LCC") in Unit 4B. Exhibit A – Historical Bed Assignment at 2. On December 5, 2022, this Court entered an order imposing a permanent injunction requiring the defendants in that case to schedule weekly Jumu'ah services for all Muslim inmates at LCC on Fridays from 12:15 p.m. to 1:45 p.m. *Elmajzoub v. Davis*, Case No. 3:19-cv-00196-MMD-CSD, ECF No. 110 at 2 (D. Nev. Dec. 5, 2022). The Court further directed that services for level 2 and 3 Muslim inmates be conducted in the Chapel or another appropriate location within LCC. *Id.*

In compliance with the Court's order, Defendants implemented a schedule under which level 1 inmates attended Friday Jumu'ah services in the Chapel, while level 2 and 3

inmates attended services in the Activity Room. Exhibit B – Religious Schedules. These schedules reflect that, effective December 5, 2022, level 2 and 3 inmates housed in Unit 4B were provided access to the Activity Room for Jumu'ah services each Friday at 12:15 p.m. *Id.* Consistent with this implementation, Hardiman's name appears on the call-out list for Islam/Muslim Jumu'ah services as early as December 2022. *Id.* The record further demonstrates that this schedule remained in place throughout the entire period relevant to Hardiman's allegations. *See Id.* Therefore, notwithstanding Hardiman's allegations, the undisputed record demonstrates that he was afforded access to the Activity Room to engage in his religious exercise.

**B. Hardiman's Grievance History**

Hardiman's grievance history clarifies the basis of his claims. On December 5, 2022, Hardiman submitted a grievance asserting that he was denied access to the Chapel and instead directed to attend Jumu'ah services in the Activity Room. Exhibit C – Grievance History at 21. According to Hardiman, the Activity Room was unfit for Jumu'ah services. *Id.* In response, Defendant Southworth explained that Hardiman was classified as a level 3 inmate and had access to religious services in the Activity Room; Southworth further noted that allowing Hardiman to attend services with level 1 inmates would be improper, and the grievance was denied. *Id.*

On December 27, 2022, Hardiman filed another grievance raising the same concern—that the Activity Room was unsuitable for Jumu'ah services. *Id.* at 20. Defendant Southworth again responded in similar fashion, noting that the institution was complying with the Court's order. *Id.* Hardiman submitted several additional grievances during the relevant period advancing the same complaint, each of which received materially similar responses. *Id.* at 12–18.

Taken together, these grievances demonstrate that Hardiman was not denied access to practice his religion; rather, his complaint centers on dissatisfaction with the location in which Jumu'ah services were conducted. *See generally* Exhibit C – Grievance History at 12-21.

**C. NDOC's Level System and OP 516**

Pursuant to AR 516.01(1), "an institution shall have a departmentally standardized level system which encourages and incentivizes offenders to work and participate in programming while allowing additional privileges." Exhibit D – AR 516, Level System at 2. Under AR 516.01(2), "[e]ach level should have performance-based criteria" evaluating offender conduct, including, but not limited to, work performance, disciplinary record, program compliance, appearance, and living environment. *Id.* These criteria apply to medium-security institutions. *Id. at 4.*

To qualify as a Level 1 inmate, the least restrictive classification, an inmate must, among other requirements, have "no major disciplinary convictions within the past 12 months," although the committee may consider the inmate's overall disciplinary history. *Id.* The inmate must also demonstrate "program compliance," including meaningful involvement, participation, and attendance. *Id.*

For Level 2 classification, "the committee should evaluate [the inmate's] disciplinary record" and consider the inmate's "program compliance." *Id.* at 4–5. Level 3, the most restrictive classification is reserved for inmates who have been removed from Levels 1 or 2, are pending disciplinary action that may result in such removal, or are subject to austere housing conditions due to noncompliance with requirements for maintaining an orderly living area. *Id.* at 5.

Moreover, LCC implemented AR 516 through OP 516. *See* Exhibit E – OP 516, Level System. Pursuant to OP 516.02, Level 3 classification is "designed to provide inmates with a structured environment where inmates are closely observed and evaluated as to their ability to integrate within the level system at LCC." *Id.* at 2.

To advance to the less restrictive Level 2 classification, an inmate must meet the following criteria: (a) no guilty major or work disciplinary offenses for six months; (b) no guilty general disciplinary offenses for three months; (c) no guilty minor disciplinary offenses for 45 days; and (d) a minimum incarceration period of six months. *Id.* at 2–3.

///

To advance to the least restrictive Level 1 classification, an inmate must meet more stringent criteria: (a) no guilty major or work disciplinary offenses for twelve months; (b) no guilty general disciplinary offenses for six months; (c) no guilty minor disciplinary offenses for three months; and (d) a minimum incarceration period of twelve months. *Id*. at 3–4. Based on the Administrative Regulations and Operational Procedures, the Level System at LCC is determined by inmates' conduct during incarceration.

**D. Hardiman's Disciplinary History**

Hardiman's disciplinary history during the relevant period explains his classification as a Level 2 or Level 3 inmate. On July 28, 2022, while housed in Unit 4B at LCC, correctional officers responded to a report that Hardiman was behaving in a hostile manner toward staff. *See* Exhibit F – Disciplinary History at 1. Upon entering the unit, officers observed Hardiman acting aggressively toward another officer. Id.

Officers instructed Hardiman to descend from the upper tier so that he could be placed in restraints and escorted from the unit. *Id.* Hardiman refused and stated that he was going to the shower. *Id.* Officers followed him to the shower, where he initially complied and allowed himself to be restrained. *Id.* However, while being escorted out, Hardiman pulled away and resumed his hostile behavior. *Id.* Officers then placed him on the ground and escorted him to medical following the incident. *Id.*

As a result of this conduct, Hardiman was found guilty of a major disciplinary offense, supporting his classification at a more restrictive level.

**III. SUMMARY JUDGEMENT STANDARD**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> A court considering summary judgment must decide if a genuine need for trial exists, "—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

> 250 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp.*, 477 U.S. at 323-24. Fed. R. Civ. Pro. 56 is the "summary judgment rule." *Id.* at 322–23.

Fed. R. Civ. Pro. 56(a) states:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion. "Under Rule 56(c), summary judgment is proper 'if . . . there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Id.* at 322 (quoting Fed. R. Civ. Pro. 56(c)). A fact is considered "material," for summary judgment purposes, if it "affect[s] the outcome of the suit." *Anderson*, 477 U.S. at 248. Accordingly, the substantive law determines the material facts. *Id.* ("[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.").

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp.*, 477 U.S. at 323. Defendants moving for summary judgment "must either produce evidence negating an essential element of the [plaintiff's] claim . . . or show that the [plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Then, "[w]hen the moving party has carried its burden under Rule 56(c)," the burden shifts to the non-moving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Court should not rely on "such visible fiction" and "view[] the facts in the light depicted by the videotape." *Id.* at 381.

It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party

asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. . . . what Rule 56(e) does make clear is that a party cannot rest on the allegations . . . contained in his pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

## IV. LEGAL ANALYSIS

### A. Hardiman Cannot Demonstrate That the Challenged Regulation Lacks a Legitimate Penological Basis

"The right to exercise religious practices and beliefs does not terminate at the prison door." The free exercise right, however, "is necessarily limited by the fact of incarceration and may be curtailed in order to achieve legitimate correctional goals or to maintain security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam) (internal citations omitted); see also *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Shakur v. Schriro*, 514 F.3d 878, 883–84 (9th Cir. 2008). To implicate the Free Exercise Clause, a prisoner's belief must be both sincerely held and rooted in religious belief. See Shakur, 514 F.3d at 884–85. "A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of [his] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). However, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interest[s]." *Turner v. Safley*, 482 U.S. 78, 89 (1987). "Such a standard is necessary if prison administrators, and not the courts, are to make the difficult judgments concerning institutional operation." *Id.* (internal quotation marks omitted).

To determine whether a prison regulation rationally serves a legitimate penological interest, courts apply the four-factor test articulated in *Turner*. First, there must be a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89–91. Second, courts consider whether "there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90 (internal citations and quotation marks omitted). Third, courts assess "the impact

accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 90–91. Moreover, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id* at 91.

**i. Turner Analysis**

Hardiman cannot demonstrate that the alternative Jumu'ah service location lacks a legitimate penological basis. Applying the *Turner* factors, the first factor is satisfied because there is a "valid, rational connection" between the challenged policy and the asserted governmental interest. *Id.* at 89–91. The policy at issue separates level 1 inmates from level 2 and 3 inmates for Friday Jumu'ah services, with level 1 inmates attending services in the Chapel and level 2 and 3 inmates attending services in the Activity Room. *See* ECF No. 8 at 4 ¶ 4.

This classification-based separation is justified by institutional safety and security concerns. Courts within the Ninth Circuit have consistently recognized that inmate classification systems serve valid penological interests. *See Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998); *see also Harrison v. Kernan*, 971 F.3d 1069 (9th Cir. 2020). As the Supreme Court has emphasized, prison officials "should be accorded wide-ranging deference in the adoption of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Turner*, 482 U.S. at 89 (internal quotation marks omitted).

Under AR 516 and OP 516, inmate classification is expressly based on objective, performance-driven criteria, including disciplinary record, program compliance, and overall conduct while incarcerated. Exhibit D at 2–5; Exhibit E at 2–4. These provisions establish a tiered Level System in which inmates who demonstrate sustained compliance and minimal disciplinary history qualify for less restrictive classifications, while inmates with recent or more serious disciplinary issues are assigned to more restrictive levels. *Id.*

///

This structured classification system is designed to incentivize positive behavior, maintain order, and ensure that inmates are housed and managed in accordance with their demonstrated conduct and risk profile. *Id.* In particular, OP 516 emphasizes that more restrictive classifications, such as Level 3, provide a controlled and closely supervised environment for inmates who have not demonstrated the ability to comply with institutional requirements. Exhibit E at 2.

Consistent with these provisions, separating inmates by classification level, including during group activities such as Jumu'ah services, serves the same underlying objectives of safety, order, and behavioral management reflected in AR 516 and OP 516. Permitting inmates from less restrictive classifications to intermingle with inmates assigned to more restrictive levels would undermine the incentive structure established by the Level System and disregard the documented behavioral distinctions on which those classifications are based.

Accordingly, the separation of Jumu'ah services by classification level is not arbitrary, but is rationally related to the legitimate penological interests embodied in AR 516 and OP 516, including maintaining institutional security, encouraging compliance, and promoting safe and orderly operations.

Next, the Court considers whether "there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. Here, Hardiman was provided with a clear alternative means of attending Jumu'ah services: he was permitted to participate in weekly services held in the Activity Room every Friday at 12:15 p.m., without hindrance.

To the extent Hardiman contends that he should have been allowed to attend services in the Chapel alongside level 1 inmates, that preference does not alter the analysis. The relevant inquiry is not whether Hardiman was afforded his preferred accommodation, but whether he retained a meaningful opportunity to exercise his religious rights. *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) Because Hardiman had an available and consistent

///

avenue to participate in Jumu'ah services, the second *Turner* factor weighs in favor of Defendants.

Courts also consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. That factor weighs in Defendants' favor here. Under AR 516 and OP 516, LCC is required to manage inmates according to a structured Level System based on disciplinary history, program compliance, and demonstrated behavior. Exhibit D at 2–5; Exhibit E at 2–4. That system necessarily informs how inmates are supervised, housed, and permitted to participate in group activities.

LCC has only one Chapel, and that logistical constraint must be managed in a manner consistent with the classification requirements set forth in AR 516 and OP 516. Requiring Defendants to allow Level 2 and Level 3 inmates—who, by definition, have more recent or serious disciplinary issues or are subject to closer supervision—to attend Jumu'ah services alongside Level 1 inmates would undermine those classification-based controls. *See* Exhibit E at 2–4. Such a mixed-level gathering would be inconsistent with the Level System's purpose of separating inmates based on demonstrated conduct and risk.

Moreover, accommodating such a change would require the institution to significantly increase supervision to account for the heightened risks associated with mixing classification levels. OP 516 specifically contemplates closer observation and structured management for higher-level inmates, particularly those in Level 3. Exhibit E at 2. To safely supervise a combined service, LCC would need to reallocate correctional staff to the Chapel, thereby diverting resources from other areas of the facility and reducing overall institutional coverage.

At the same time, combining inmates of differing classification levels in a confined setting would elevate the risk of disruption, noncompliance, or violence, undermining the behavioral incentives and security objectives embedded in AR 516 and OP 516. Accordingly, the resource burden and increased security risks associated with such accommodation weigh strongly against it.

In short, accommodating Hardiman's preferred arrangement would impose significant burdens on staffing, compromise institutional security, and adversely affect other inmates. Accordingly, the third *Turner* factor strongly supports the reasonableness of Defendants' policy.

Lastly, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90–91. Moreover, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91.

Here, there are no obvious, readily available alternatives that would accommodate Hardiman's preference without undermining legitimate penological interests. As discussed, LCC has only one Chapel available for use at any given time, and Hardiman has already been provided with an alternative location in which to attend Friday Jumu'ah services. The record further reflects that the Activity Room is routinely used by multiple faith groups for religious services and programming. *See generally* Exhibit B.

Under these circumstances, Defendants were not required to devise or implement additional alternatives, particularly where doing so would implicate staffing constraints and institutional security concerns. *Turner*, 482 U.S. at 90–91. The Constitution does not guarantee Hardiman his preferred venue for worship, only a reasonable opportunity to exercise his faith. *Ward*, 1 F.3d at 877. Defendants provided such an opportunity, and Hardiman's dissatisfaction with the location does not overcome the deferential standard governing prison regulations. *See O'Lone*, 482 U.S. at 350 (explaining that placing the burden on prison officials to disprove all alternatives "fails to reflect the respect and deference that the United States Constitution allows for the judgment of prison administrators.").

Accordingly, all four *Turner* factors weigh in favor of Defendants, and summary judgment should be granted on Hardiman's First Amendment claim.

///

///

### B. Defendants Are Entitled to Summary Judgment Because Hardiman Cannot Demonstrate That the Challenged Policy Imposed a Substantial Burden on His Religious Exercise Under RLUIPA

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates the burden is "in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a).The Ninth Circuit has explained that this inquiry is analogous to strict scrutiny analysis. *Walker v. Beard*, 789 F.3d 1125, 1136 (9th Cir. 2015).

RLUIPA defines a religious exercise to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). The definition is intentionally broad. *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 986 (9th Cir.2008). It covers "not only belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine. . . ." *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) (emendations in original) (internal quotation marks omitted)).

#### i. Substantial Burden Analysis

To constitute a substantial burden, a limitation of religious practice "must impose a significantly great restriction or onus upon such exercise." *San Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004). A substantial burden need not actually force a litigant to change his practices; a violation may occur "where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005). Moreover, government action that "threatens punishment to coerce a prisoner to forgo her or his religious beliefs, or causes substantial delay, uncertainty, and expense to worship" may constitute a

///

substantial burden. *Johnson v. Baker*, 23 F.4th 1209, 1215-16 (9th Cir. 2022) (internal citations and quotation marks omitted).

Here, no such substantial burden is imposed on Hardiman's religious exercise. Under the Activity Room Religious Schedules, Hardiman is afforded a meaningful and consistent opportunity to attend Friday Jumu'ah services, absent emergency circumstances. *See* Exhibit B. Although Hardiman contends that his inability to attend services in the Chapel burdens his religious practice, that assertion is contradicted by the undisputed record. *Id.*

At most, the record reflects a preference—not a deprivation. While Hardiman may prefer to attend Jumu'ah services in the Chapel, he remains free to practice his faith through services held in the Activity Room. Moreover, Defendants' decision to hold Jumu'ah services for level 2 and 3 inmates in an alternative location was not arbitrary, but instead consistent with this Court's Modified Permanent Injunction in *Elmajzoub v. Davis*, Case No. 3:19-cv-00196-MMD-CSD, ECF No. 110 at *2 (D. Nev. Dec. 5, 2022), which expressly contemplated that such services could be conducted in the Chapel or another location within LCC. In light of that directive, Defendants' actions reflect compliance with a court-ordered framework rather than any effort to burden religious exercise. As such, no burden has been placed on Hardiman's religious exercise.

**ii. Strict Scrutiny Analysis**

Even if the Court were to find a genuine dispute of material fact as to whether a substantial burden has been imposed on Hardiman's religious exercise, the challenged policy nevertheless survives RLUIPA's demanding strict scrutiny standard. Under RLUIPA, the government must "demonstrate [that] the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a). Although the Ninth Circuit has recognized that RLUIPA's standard of review is akin to strict scrutiny, that standard is applied with important contextual considerations in the prison setting. *Walker*, 789 F.3d at 1136.

In *Cutter*, the United States Supreme Court made clear that RLUIPA "does not elevate accommodation of religious observances over an institution's need to maintain order and safety. Accommodation must be measured so that it does not override other significant interests." *Cutter*, 544 U.S. at 710. The Court further emphasized that "[t]here is no reason to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns." *Id.* Indeed, "[l]awmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions and anticipated that courts would apply the Act's standard with due deference to prison administrators' experience and expertise." *Id.* (emphasis added). Accordingly, prison security constitutes a compelling governmental interest. *Greene*, 513 F.3d at 988.

The record reflects the concrete security risks associated with disregarding classification distinctions established under AR 516 and OP 516. Those provisions are premised on documented differences in inmate conduct, disciplinary history, and need for supervision. When inmates who require closer management are placed in the same confined, group setting as those who have demonstrated sustained compliance, the risk of disruption and escalation materially increases.

These risks are particularly pronounced in congregate settings such as Jumu'ah services, where supervision is necessarily shared and the number of inmates exceeds that of a typical housing unit. Mixing classification levels in that context undermines the behavioral and supervisory distinctions embedded in the Level System and creates conditions that increase the likelihood of conflict, noncompliance, and potential violence. These concerns are not theoretical, but reflect the practical realities of managing inmate populations in accordance with established classification standards.

Moreover, the policy at issue represents the least restrictive means of furthering that compelling interest. Although prison administrators are afforded deference in matters of institutional security, they must still demonstrate that they "considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Greene*, 513 F.3d at 889–90. The record here satisfies that requirement.

Defendants did not bar Hardiman from attending Jumu'ah services or otherwise practicing his faith. Instead, they implemented a reasonable accommodation that permits full participation while preserving necessary security protocols. *See* Exhibit B. By designating a separate, consistent location for level 2 and 3 inmates, Defendants ensured access to congregate worship while minimizing the risks inherent in mixing custody levels. *Id.* This approach reflects a careful balance between religious accommodation and institutional safety. Hardiman cannot identify an alternative that would both accommodate his preference and adequately address the same security concerns, and none is apparent from the record.

Importantly, the current Activity Room Religious Schedule was not adopted arbitrarily. It is the product of deliberate policy development undertaken in response to this Court's ruling in *Elmajzoub v. Davis*, Case No. 3:19-cv-00196-MMD-CSD (D. Nev. Dec. 5, 2022). In implementing that order, Defendants acted in good faith to ensure that level 2 and 3 Muslim inmates retained meaningful access to Jumu'ah services while maintaining institutional order and security. The resulting schedule reflects both compliance with the Court's directive and a reasoned evaluation of available alternatives.

Accordingly, even under RLUIPA's heightened standard, the challenged policy is lawful. Because it advances a compelling governmental interest and does so through the least restrictive means available, Hardiman's RLUIPA claim fails as a matter of law, and summary judgment should be granted in Defendants' favor.

### C. Hardiman Fails to Establish Membership of a Cognizable Suspect Class Under the Fourteenth Amendment

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all similarly situated persons be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state an equal protection claim, a plaintiff must allege facts showing that defendants acted with a discriminatory intent or purpose, either by discriminating against a protected class or by intentionally treating the plaintiff differently from similarly situated individuals without a rational basis. *Lee v. City*

*of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001); *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

In evaluating such a claim, courts first determine the applicable level of scrutiny. "Strict scrutiny applies if the at-issue policy discriminates against a suspect class or infringes upon a fundamental right." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Where no suspect class or fundamental right is implicated, the challenged policy is reviewed under rational basis scrutiny, under which "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *Id.* A showing of mere inequality is insufficient; the Constitution does not require identical treatment. *McQueary v. Blodgett*, 924 F.2d 829, 835 (9th Cir. 1991). Rather, a plaintiff must demonstrate that the challenged classification is motivated by an invidious or illegitimate purpose, as "the Fourteenth Amendment guarantees equal laws, not equal results." *Personnel Adm'r v. Feeney*, 442 U.S. 256, 273 (1979).

In the prison context, equal protection claims are further informed by the deferential standard set forth in *Turner v. Safley*, under which prison regulations are valid if they are "reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987); *see also Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993).

Critically, prisoners are not a suspect class for purposes of equal protection analysis. *Glauner v. Miller*, 184 F.3d 1053, 1054 (9th Cir. 1999). Nor does Hardiman possess a fundamental right in a less restrictive classification. *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). Accordingly, rational basis review applies.

Here, Hardiman alleges that he and other Level 2 and Level 3 Muslim inmates are subjected to discrimination based on religion. *See* ECF No. 8 at 4 ¶ 4. The record, however, demonstrates that the differential treatment at issue is based on behavioral classification, not religious affiliation. *See* Exhibit D at 2–5; Exhibit E at 2–4. Under AR 516 and OP 516, inmate classification is determined by objective criteria, including disciplinary history, program compliance, and demonstrated conduct, and those classifications govern inmate movement, supervision, and participation in group activities. *Id.* Muslim inmates

assigned to Level 1 are permitted to attend Jumu'ah services in the Chapel, confirming that access is not restricted on the basis of religion.

Accordingly, the disparity Hardiman identifies stems from his classification within the Level System, not from religious discrimination. He is not similarly situated to Level 1 inmates, who differ in terms of disciplinary record, compliance, and overall risk profile under the governing regulations. These distinctions are central to the operation of the classification system and preclude any meaningful comparison for equal protection purposes.

Finally, for the same reasons discussed above, the challenged policy satisfies the *Turner* standard. The separation of inmates by classification level, including during religious services, is reasonably related to legitimate penological interests reflected in AR 516 and OP 516, including maintaining institutional security, incentivizing compliance, and ensuring orderly operations. Accordingly, Defendants are entitled to summary judgment because Hardiman's equal protection claim fails as a matter of law.

### D. Hardiman's Conspiracy to Violate Rights Claim Fails Because He Cannot Establish an Equal Protection Violation

To sustain a cause of action under 42 U.S.C. § 1985(3), a plaintiff must show: "(1) a conspiracy, (2) to deprive any person or a class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, property damage or a deprivation of any right or privilege of a citizen of the *United States.*" *Gillespie v. Civiletti*, 629 F.2d 637, 641 (9th Cir. 1980) (*citing Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)). Critically, "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin v. Breckenridge*, 403 U.S. at 102.

///

The Ninth Circuit has further held that § 1985(3) applies beyond race only in limited circumstances, "when the class in question can show that there has been a governmental determination that its members require and warrant special federal assistance in protecting their civil rights." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (internal quotations omitted). This requires either that the class has been designated as suspect or quasi-suspect, or that Congress has indicated through legislation that the class warrants special protection. *Id.* The Ninth Circuit has not resolved whether religious animus falls within the scope of § 1985(3). *See Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 524 (9th Cir. 1994). However, courts within this District have recognized that religious animus may be sufficient in certain circumstances. *See Howard v. Connett,* Case No. 2:11-cv-01402-APG, 2014 WL 587400, at *19 (D. Nev. Feb. 14, 2014).

Here, Hardiman's § 1985(3) claim fails because he cannot satisfy the requirement that the alleged conspiracy was motivated to, and actually did, deprive him of equal protection of the laws. As discussed above, the record establishes that the differential treatment at issue is based on inmate classification under AR 516 and OP 516, not membership in any protected or quasi-protected class. That classification scheme is grounded in objective factors such as disciplinary history, program compliance, and institutional conduct, and is rationally related to legitimate penological interests. Turner, 482 U.S. at 89.

Accordingly, absent an underlying equal protection deprivation, the claim fails as a matter of law.

### E. Defendants Southworth, Garrett, and Wickham are Entitled to Summary Judgement Because They Did Not Personally Participate in the Alleged Violations

"Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (*citing Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979)). A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 800 F.2d 1040,

1045 (9th Cir. 1989). "There is no respondeat superior liability under section 1983." *Id.*, citing *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81 (9th Cir. 1984).

A defendant "causes" a constitutional deprivation when he (1) "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he [or she] is legally required to do that causes the deprivation"; or (2) "set[s] in motion a series of acts by others which the [defendant] knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) (citations omitted); *see also Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc) (same). Allegations regarding causation "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (citations omitted). An allegation that a prison official inappropriately denied or failed to adequately respond to a grievance, without more, does not state a claim under § 1983. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (*citing Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.1988)).

Courts within the Ninth Circuit have consistently held that "merely denying a grievance without some decision-making authority or ability to resolve the underlying issue grieved is not enough to establish personal participation." *Jackson v. Nevada*, No. 2:16-cv-00995-APG-NJK, 2019 WL 6499106, at *7 (D. Nev. December 3, 2019); *see also Stewart v. Warner*, No. C15-5243 RBL-KLS, 2016 WL 1104893, at *5 (W.D. Wash. Feb. 29, 2016), *report and recommendation adopted*, No. C15-5243 RBL-KLS, 2016 WL 1089974 (W.D. Wash. Mar. 21, 2016) (holding that nurses who had reviewed and denied the plaintiff's grievances did not personally participate in alleged Eighth Amendment violations because they did not have decision-making authority over the plaintiff's care); *see also May v. Williams*, No. 2:10–cv–576–GMN–LRL, 2012 WL 1155390, at *3 (D. Nev. Apr. 4, 2012) (finding that merely denying grievances is not enough to establish a constitutional claim).

Here, Hardiman alleges only that Defendants Southworth, Garrett, and Wickham denied his grievances with "copy and paste" responses and, by doing so, allegedly endorsed the Jumu'ah services policy. ECF No. 8 at 3 ¶ 4. Critically, however, the complaint contains no allegations that these Defendants were involved in the creation, implementation, or enforcement of the challenged policy. Absent such involvement, their limited role in responding to grievances and referencing existing policy does not constitute personal participation in the alleged constitutional violations. See May v. Williams, No. 2:10–cv–576–GMN–LRL, 2012 WL 1155390, at *3 (D. Nev. Apr. 4, 2012).

Accordingly, Defendants Southworth, Garrett, and Wickham are entitled to summary judgment as a matter of law because Hardiman fails cannot demonstrate their personal participation in the alleged violations.

**F. Defendants Are Entitled to Qualified Immunity**

The defense of qualified immunity protects state officials sued in their individual capacities from damages unless the conduct complained of violates a clearly established constitutional or statutory right of which a reasonable person would have known. *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001). Therefore, regardless of whether a constitutional violation occurred, state officers prevail if the right asserted by the plaintiff was not "clearly established" or if the state officers could have reasonably believed their conduct was lawful. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

The plaintiff bears the burden of proving that a right allegedly violated was clearly established at the time of the alleged misconduct. *Baker v. Racansky*, 887 F.2d 183, 186 (9th Cir. 1989) (citing *Davis v. Scherer*, 468 U.S. 183, 197 (1984)). When a public official acts in reliance on a statute or regulation, that official is entitled to qualified immunity unless the statute or regulation is "patently violative of fundamental constitutional rights." *Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999) (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994)).

A reasonable but mistaken belief one's actions are lawful, based on facts or legal authority, entitles a defendant to qualified immunity. *Floyd v. Laws*, 929 F.2d 1390, 1394

(9th Cir. 1991). Qualified immunity shields government officials from suit against constitutionally deficient decisions that reasonably misapprehend the law; it extends to "all but the plainly incompetent or those who knowingly violate the law." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (citations omitted). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (citations omitted.).

In *Schroeder v. McDonald*, the Ninth Circuit Court of Appeals discussed the importance of deciding immunity questions early on in the litigation. The Court stated:

> The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." The rule of qualified immunity "'provides ample support to all but the plainly incompetent or those who knowingly violate the law.'" "Therefore, *regardless of whether the constitutional violation occurred*, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Furthermore, "[t]he entitlement is an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial."

55 F.3d 454, 461 (9th Cir. 1995) (emphasis in original; internal citations omitted).

When conducting qualified immunity analysis, district courts "ask (1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established." *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). The court may analyze the elements of the test in whatever order is appropriate under the circumstances of the case. *Pearson*, 555 U.S. at 240-42. Whether the right is established is an objective inquiry, and it turns on whether a reasonable official in the defendant's position should have known at the time that his conduct was constitutionally infirm. *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987); *Lacey v. Maricopa Cnty*, 693 F.3d 896, 915 (9th Cir. 2012).

Stated differently, only where a state official's belief as to the constitutionality of his conduct is "plainly incompetent" is qualified immunity unavailable. *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (per curium). Although the second inquiry is highly deferential, it is not

necessary that the precise action has previously been held unlawful for a right to be "clearly established." *Anderson*, 483 U.S. at 640. Therefore, the Court must assess qualified immunity "in light of the specific context of the case." *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Robinson v. York,* 566 F.3d 817, 821 (9th Cir. 2009)).

In *Reichle v. Howards*, 566 U.S. 658, 664, (2012), the Court explained to "be clearly established, a right must be sufficiently clear "that every 'reasonable official would have understood that what he is doing violates that right.'" The "right allegedly violated must be established, not as a broad general proposition,' but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id.* at 665. "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 664. "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." *Id.*

In *Carley*, this Court recognized "the Supreme Court 'has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" 103 F.4th at 660–61, quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). "It is not enough that a rule be suggested by then-existing precedent." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "Thus, to show a violation of clearly established law, [plaintiff] must identify a case that put [each defendant] on notice that his specific conduct was unlawful." *Id.* Officers "are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 584 U.S. at 104. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 105.

Accordingly, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 104.

Regardless of whether a constitutional violation occurred, state officers prevail if the right asserted by the plaintiff was not "clearly established" or if the state officers could have reasonably believed their conduct was lawful. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). More importantly, the plaintiff bears the burden of proving that a right allegedly violated was clearly established at the time of the alleged misconduct. *Carley*, 103 F.4th at 659-60; *Baker v. Racansky*, 887 F.2d 183, 186 (9th Cir. 1989).

Here, the Defendants are entitled to qualified immunity under both prongs of this required analysis.

**1. No Constitutional Violation Occurred**

As shown in depth above, Defendants did not violate Hardiman's constitutional rights. As such, Defendants are entitled to qualified immunity at the first prong of the analysis.

**2. No Clearly Established Constitutional Right Exists**

Should this Court conclude there may be a genuine issue of material fact as to whether either a constitutional violation occurred, based on Hardiman's allegations, qualified immunity is still appropriate because there is no case that would put Defendants on "clear notice" that their actions violated Hardiman's constitutional rights. Defendants are entitled to qualified immunity at the second prong of the analysis.

In C*unningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000), this Court held that resolving dispositive motions "based on qualified immunity" requires conducting an "individualized analysis . . . , examining each of the . . . elements of the alleged" cause of action, when determining whether the law was clearly established. To meet his burden, Hardiman would have to find binding authority holding that the personal actions of each individual Defendant, as established by actual evidence in the record, met each element required to violate the First Amendment.

///

In *Carley v. Aranas*, the Ninth Circuit stated that "the Supreme Court 'has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" 103 F.4th 653, 660–61 (9th Circ. 2024) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). "It is not enough that a rule be suggested by then-existing precedent." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "Thus, to show a violation of clearly established law, [plaintiff] must identify a case that put [each defendant] on notice that his specific conduct was unlawful." *Id.* Officers "are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 584 U.S. at 104. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* at 105. Accordingly, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 104.

Or, as stated more plainly and concisely recently, in *Zorn v. Linton*, No. 25-297, 2026 WL 795469 (U.S. March. 23, 2026) (per curiam): "To find that a right is clearly established, courts generally 'need to identify a case where an officer acting under similar circumstances . . . was held to have violated' the Constitution, and that the previous case could have been "read" by the officers beforehand to know that their specific actions (or inactions) were proscribed by that particular case. *Id.* (internal citations omitted).

There is no case law that would have put Defendants on notice that by providing Hardiman with a place to practice his religion would violate his constitutional rights. Hardiman therefore cannot meet his burden of establishing a constitutional violation, much less a violation that was clearly established. *See Carley*, 103 F.4th at 659-60. Defendants therefore are entitled to qualified immunity as a matter of law.

///

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant them summary judgment in its entirety.

DATED this 28th day of April, 2026.

AARON D. FORD
Attorney General

By: /s/ Victoria C. Corey
VICTORIA C. COREY, Bar No. 16364
Senior Deputy Attorney General
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on this 28th day of April, 2026, I filed the foregoing, **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, via this Court's electronic filing system. Parties that are registered with this Court's electronic filing system will be served electronically.

Andre Hardiman, #1124932
Lovelock Correctional Center
1200 Prison Road
Lovelock, NV 89419
*Plaintiff, Pro Se*

An employee of the
Office of the Nevada Attorney General